[Cite as *In re X.R.*, 2026-Ohio-2825.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE X.R., ET AL.                    :

                                                            No. 115920
Minor Children                     :

[Appeal by C.H., Mother]     :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 23, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-24-909172 and AD-25-907936

---

*Appearances:*

Caitlin E. Monter, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

DEENA R. CALABRESE, J.:

{¶ 1} Appellant C.H. ("Mother") appeals the dispositional orders of the
Cuyahoga County Court of Common Pleas, Juvenile Division ("juvenile court"), that
terminated her parental rights and awarded permanent custody of two of her four
children, L.H. (d.o.b. 6/29/2010) and X.R. (d.o.b. 9/21/2021) (collectively "the
children"), to appellee the Cuyahoga County Department of Children and Family

Services ("CCDCFS").  For the reasons stated below, we affirm the juvenile court's orders.

## I. Relevant Facts and Procedural History

{¶ 2} This appeal involves Mother and two of her four children, X.R. and L.H. Mother and her children have a history of involvement with CCDCFS with issues surrounding domestic violence and sexual abuse.  L.H. is Mother's oldest child and X.R. is her youngest child.  Mother's two middle children reside in Michigan with their father, A.W.  A.W. is also the father of X.R.  L.H.'s alleged father is deceased. A.W. was present at the dispositional hearing, and his appeal is a companion case to Mother's appeal.  *See In re X.R.*, 8th Dist. Cuyahoga No. 115955.

### A. L.H.

{¶ 3} L.H. was previously removed from Mother's care in 2023 because of allegations that he sexually abused another child in the home.  He was adjudicated dependent and placed in the temporary custody of CCDCFS.  In July 2025, L.H. was reunified with Mother, and CCDCFS was granted protective supervision.  Two weeks later, L.H. was removed from Mother's custody by law enforcement after Mother's brother, C.H. ("Uncle"), abused his own children in the presence of Mother and L.H. On August 13, 2025, CCDCFS filed a complaint alleging L.H. is an abused and dependent child with a dispositional request for permanent custody, and a motion for predispositional temporary custody.  On the same day, the trial court granted the motion for predispositional temporary custody.  A case plan was filed, and Mother's case-plan goals included completing services related to parenting, domestic

violence, mental health, and family preservation.  On November 4, 2025, L.H. was adjudicated an abused and dependent child.

**B. X.R.**

{¶ 4} On September 9, 2024, CCDCFS filed a complaint alleging that X.R. is an abused and neglected child.  The complaint alleged that X.R. witnessed domestic violence and was injured by Mother's husband, S.B.S., during a domestic-violence incident while the family was in Michigan.  The complaint further alleged that Mother "refused to take appropriate measures or make alternative arrangements for the continued safety of her child."  On September 10, 2024, the juvenile court granted CCDCFS's motion for predispositional temporary custody.  A case plan was filed with the permanency plan of reunification.  Mother's case-plan goals were to complete services related to parenting, domestic violence, mental health, and to maintain basic needs.

{¶ 5} On December 4, 2024, X.R. was adjudicated an abused and neglected child and placed in the temporary custody of CCDCFS.  On July 17, 2025, CCDCFS filed a motion for a first extension of temporary custody.  In the motion, CCDCFS asserted that Mother had completed domestic-violence counseling, but that there were ongoing concerns as to whether Mother had benefited from those services.  On August 27, 2025, CCDCFS filed a motion to amend the motion for a first extension of temporary custody to a motion to modify temporary custody to permanent custody to CCDCFS.

## C. The Permanent-Custody Hearing

{¶ 6} On November 4, 2025, the juvenile court held a dispositional hearing on CCDCFS's dispositional request for permanent custody of L.H. and CCDCFS's motion to modify temporary custody to permanent custody of X.R. The juvenile court held L.H.'s adjudicatory hearing immediately prior to the dispositional hearing for both children. Testimony and evidence submitted for the adjudication of L.H. was incorporated into the dispositional hearing without objection. In the adjudicatory hearing for L.H. and the dispositional hearing, the juvenile court heard testimony from case worker Re'Gine Wells ("Wells"), Officer Thomas Brady ("Ofc. Brady"), therapist Kathryn Conners ("Conners"), supervisor Jacqueline Petraglia ("Petraglia"), and Mother's sister, S.H., and heard the recommendation from the guardian ad litem, Ashley Lockemer ("the GAL"). The relevant testimony and evidence presented at the hearings were as follows.

## D. CCDCFS's Witnesses

### 1. Re'Gine Wells

{¶ 7} Wells testified that she is a CCDCFS ongoing sex abuse case worker. She was first assigned to the case during L.H.'s initial placement in CCDCFS custody.

{¶ 8} CCDCFS became involved with the other children in the family after X.R. was injured during the domestic-violence incident with S.B.S. in Michigan. CCDCFS scheduled a staffing for the family after the Michigan incident. Mother appeared at the staffing and reported that she had taken the three youngest children, including X.R., to Michigan to stay with maternal grandmother. At that point,

CCDCFS initiated a plan for all three children to be placed with maternal grandmother on a safety plan. However, maternal grandmother transferred care of the middle two children to their father, A.W., without CCDCFS's knowledge or consent. Mother later brought X.R. back to her home in Ohio and refused to allow him to be placed outside her home on a safety plan. This led to CCDCFS filing the complaint requesting removal of X.R. from Mother's care.

{¶ 9} In addition to the Michigan incident where X.R. was injured, Wells indicated that Mother reported other domestic-violence incidents involving S.B.S. Mother and S.B.S. were involved in several domestic-violence incidents in the presence of the three youngest children while Mother and S.B.S. were still married. Mother divorced from S.B.S. after X.R. was removed from her care. After the divorce, Mother reported that she was afraid of S.B.S. and that he would come to her home unannounced even after a protection order was in place. Mother also reported that she was engaged in a domestic-violence incident with S.B.S. in June 2025 while L.H. was present. During that incident, Mother opened the door to retrieve an Amazon package and S.B.S. attacked her. As a result, S.B.S. was indicted and Mother and L.H. spent approximately one month in a domestic-violence shelter. Wells noted that Mother gave differing versions of the June 2025 incident to her and to law enforcement.

{¶ 10} Wells further testified that Mother allowed Uncle, his wife ("Aunt"), and their four children ("Cousins") to move into the home she shared with L.H. after they were evicted. Wells advised Mother that allowing Uncle and his family to move

into the home was a poor decision because CCDCFS still had concerns about domestic violence and because L.H. had previously committed acts of sexual abuse against a younger child. Prior to moving into Mother's home, Uncle had a substantial CCDCFS history that indicated a propensity for violence. Wells stated there were several CCDCFS investigations where Uncle was the perpetrator of abuse against children in Mother's home, including a prior incident where he physically abused Mother's child. On August 8, 2025, Mother told Wells that Uncle and his family were not residing with her, which Wells later learned was untrue. Later that day, Mother and L.H. were present in the home when Uncle committed acts of physical abuse on his own children. Mother did not intervene and later told Wells she did not intervene because she was afraid and locked herself in her room.

{¶ 11} Wells also testified that although Mother completed case-plan services, Mother did not benefit from the services. Wells testified that the case plan required Mother to maintain housing and basic needs, and to complete services regarding mental health, parenting, and domestic-violence concerns. The goal of the case-plan services was to address Mother's victimization, decision-making skills, and parenting skills. Mother completed the services but continued to have domestic-violence incidents in her home and in the presence of the children. Mother was involved in four domestic-violence incidents between August 2024 and August 2025. In addition, Wells stated that Mother responded to the August 8, 2025 domestic-violence incident in her home in the same manner that she had responded to previous domestic-violence incidents. Those responses included not being

truthful about the incident, not cooperating with law enforcement, minimalization of the concerns, and poor decision-making and parenting skills.

{¶ 12} Mother did not visit the children consistently. In the month preceding the dispositional hearing, Mother missed three visits with X.R. and left early from one visit. She gave various reasons for missing visits, including reporting that she was concerned for her own safety because of S.B.S., that she left early because she had an appointment, or she simply missed appointments without explanation.

{¶ 13} Mother was also inconsistent with visits and contact with L.H. Wells stated that when L.H. was previously in CCDCFS custody, Mother indicated she did not wish to pursue reunification with him and did not make efforts to visit him. Mother indicated this was because of her own trauma. When L.H. returned to CCDCFS custody in this case, Mother initially indicated she only wished to pursue reunification with X.R. and again did not make efforts to visit L.H. She indicated this was because she had concerns about his inappropriate behavior. Mother has had one virtual visit and a few phone calls with L.H. since his second removal from her home. L.H. reported to Wells that he called Mother often, and that she usually stated she was busy, she would be asleep, or she would not answer the call. Only after CCDCFS filed a complaint pursuing a disposition of permanent custody did Mother express an interest in reunification with L.H.

{¶ 14} Wells gave several reasons for her concern of X.R.'s safety in Mother's home. She stated that even though X.R. was not present during the August 8, 2025 incident with Uncle, the incident raised concerns about his safety if he was to be

returned to the home. Mother had a history of allowing violent people into the home. X.R. was removed from the home because of a domestic-violence incident, and a child his age was hurt during the August 8, 2025 incident. Wells further noted that X.R. was young and not able to protect himself.

{¶ 15} Wells testified that efforts were made to place both children with family members. Mother provided names of her relatives, but they each proved to be unwilling to take the children or were found to be inappropriate placements. X.R.'s father established paternity while the case was pending. As a result, X.R.'s paternal grandmother was identified late in the case as a possible placement. CCDCFS was still investigating X.R.'s paternal grandmother as a potential placement.

{¶ 16} Wells testified that both children had a bond with Mother. Mother would do L.H.'s hair, and they would watch movies together, go on walks, and ride around in the car. L.H. wanted to have contact with Mother and see her; however, he also expressed concerns about Mother not being honest. X.R. was always excited to see Mother and their interactions were appropriate.

### 2. Officer Thomas Brady

{¶ 17} Ofc. Brady testified that he is employed with the Cuyahoga Metropolitan Housing Authority police. On August 8, 2025, he responded to the call that an assault had occurred at Mother's home. When Ofc. Brady arrived at Mother's home, she initially indicated that no domestic-violence incident had taken place and reported that Uncle was not inside the home. After a search of the home,

Uncle was found in an upstairs bedroom. Mother later reported to Ofc. Brady that Uncle struck his child with a belt. She also stated that the child later vomited and refused to eat, leading Mother to tell Uncle and Aunt that the child required emergency medical care. An ambulance was called several hours after the incident. Ofc. Brady learned that a camera was installed in Mother's living room. Mother voluntarily turned over video from the living room camera ("the video"). The video will be discussed in further detail below.

### E. Mother's Witnesses

### 1. Kathryn Conners

{¶ 18} Kathryn Conners ("Conners") testified that she is a behavioral health therapist at The Centers for Families ("The Centers"). She is Mother's second therapist at The Centers and has provided therapy for Mother since December 2024. Mother booked 37 therapy sessions with The Centers and missed six of those sessions. Typically, Mother schedules two sessions per month; however, some months she only schedules one session. Mother has been diagnosed with posttraumatic stress disorder ("PTSD"). Their sessions focus on increasing Mother's ability to regulate her emotions by working on her tolerance skills, effective communication skills, mindfulness, and grounding. Mother has made progress on these skills since she started therapy because her anxiety and depressive symptoms have decreased. Mother completed phase 1 of eye movement desensitization and reprocessing ("EMDR") therapy. EMDR consists of eight phases and phases three through seven take the longest. Conners stated that the improvement in Mother's

ability to regulate her emotions should result in an improvement in decision making. The therapy sessions have not addressed skills such as keeping children safe in the home or reacting to domestically violent situations.

**2. Jacqueline Petraglia**

{¶ 19} Petraglia testified that she is an in-home supervisor for Family Preservation at Applewood Centers ("Applewood"). She had been working with Mother for the eight months prior to the dispositional hearing. During that time, Mother attended 38 appointments. At Applewood, Mother was diagnosed with bipolar disorder, anxiety, and PTSD. Mother's therapy goals were to process trauma, learn to set healthy boundaries, safety planning, learn appropriate communication skills with children, and reacclimate to having the children in the home.

**3. S.H.**

{¶ 20} S.H. testified that she is Mother's sister. She resides in Michigan with her own three children and was unemployed at the time of the hearing. S.H. testified that she expressed an interest in being a placement for both L.H. and X.R. in the August staffing, but she never heard from Wells or anyone at CCDCFS. S.H. was told that L.H. could not be placed with her because she has a young daughter.

**F. GAL Recommendation**

{¶ 21} On October 28, 2025, the GAL filed a report and recommendation and placed her recommendation on the record at the conclusion of the dispositional hearing. The GAL noted that both children were bonded with Mother and that L.H.

expressed that he wished to return to Mother's home.  For each case, the GAL recommended that temporary custody with CCDCFS was in the children's best interest.  She recommended that placement of X.R. with a relative should be explored further and that L.H. complete the program at the residential treatment facility where he was placed.  As the basis for her recommendation, the GAL stated that Mother was working on her case-plan objectives and that "the person that inflicted the violence in August has had an opportunity to get his kids back with temporary custody, so [she] believe[d] that [M]other should have an opportunity to work on her case plan objectives and get her kids back."

### G. The Video

{¶ 22} Both CCDCFS and Mother admitted excerpts taken from the video of the incident that occurred on August 8, 2025, in Mother's living room.

{¶ 23} CCDCFS admitted Exhibits 7-A, B, and C showing three separate excerpts from the video.  Ofc. Brady identified the individuals in the excerpts as Mother, L.H., Uncle, Aunt, and Cousins.  In the first excerpt, Uncle's older child is seen standing on one leg facing a wall with both arms raised straight up in the air. Uncle strikes an individual that is off screen with a kitchen towel then scolds that individual.  In the second excerpt, Uncle is seen scolding his older child while she continues to stand on one leg facing the wall with arms raised.  Then he strikes her with the kitchen towel causing her to fall, firmly seizes her by the wrist, and forcefully pulls her and propels her across the room.  The child is crying and visibly terrified.  Mother is seen walking across the room and calmly retrieving her phone

from Uncle.  She does not react to Uncle's abuse or the child's distress.  In the last excerpt, the older child is still standing on one leg facing the wall with arms held high.  Uncle is seen striking the older child and the off-screen individual with a kitchen towel.  He also strikes his older child across the face with the kitchen towel, then forcefully propels her across the room by her arm a second time.  The entire time he is scolding the children.

{¶ 24} Mother admitted a different portion of the video as defense Exhibit G. In this video, two children are standing on one leg facing the wall with arms held high.  Ofc. Brady identified the two children as Uncle's children.  Uncle is pacing with a belt in his hand and scolding both children.  Mother confronts Uncle and says "you didn't have to hit her that hard" repeatedly.  She also is seen inspecting the children's torsos and arms and takes the belt from Uncle.  Then she tells Uncle that he left welt marks on the children with the belt and a bruise on the older child's neck. Uncle continues to scold the children and threatens to hit the older child in the face as he clenches his fist in a threatening manner.

## H. The Decision

{¶ 25} On November 21, 2025, the juvenile court issued journal entries in each case terminating Mother's parental rights and granting permanent custody of L.H. and X.R. to CCDCFS.

{¶ 26} Mother's appeal followed.  She raises the following single assignment of error for our review:

> The trial court erred and abused its discretion when it found by clear and convincing evidence that X.R. and L.H. could not be placed with

their mother within a reasonable time or should not be placed with mother.

## II. Law and Analysis

{¶ 27} In her sole assignment of error, Mother argues that the juvenile court's orders granting permanent custody of the children to CCDCFS are against the manifest weight of the evidence and are not supported by sufficient evidence.

{¶ 28} A juvenile court's decision to grant permanent custody is reviewed under a manifest-weight-of-the-evidence and/or sufficiency-of-the-evidence standard. *In re H.G.*, 2024-Ohio-3408, ¶ 13 (8th Dist.), citing *In re Z.C.*, 2023-Ohio-4703, ¶ 11. In this case, Mother's argument demands both manifest-weight-of-the-evidence and sufficiency-of-the-evidence review.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179,] ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 14.

{¶ 29} "When applying a sufficiency-of-the-evidence standard, an appellate court should affirm a trial court when the evidence is legally sufficient to support the factfinder's determination as a matter of law." *In re D.D.*, 2026-Ohio-1973, ¶ 64 (8th Dist.), citing *In re Z.C.* at ¶ 13. "Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.), citing *In re C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.).

{¶ 30} The juvenile court's standard of proof when conducting permanent-custody proceedings is clear and convincing evidence. *See* R.C. 2151.414(B)(1). Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence' but not to the extent of such certainty required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re A.M.*, 2024-Ohio-1168, ¶ 15 (8th Dist.), quoting *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist. 1994), citing *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176 (1987).

## A. L.H.

{¶ 31} In L.H.'s case, CCDCFS filed a complaint for permanent custody. A complaint with an original dispositional request for permanent custody must meet two statutory requirements before ordering that a child be placed in the permanent custody of a children's services agency. In the first statutory requirement, the

juvenile court determines whether "in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." *See* R.C. 2151.353(A)(4). In the second statutory requirement, the juvenile court determines whether, in accordance with R.C. 2151.414(D)(1), that the permanent commitment is in the best interest of the child. *Id.*

**B. X.R.**

{¶ 32} In X.R.'s case, CCDCFS filed a motion to modify temporary custody to permanent custody. There are also two statutory requirements before ordering that a child be placed in the permanent custody of a children's services agency pursuant to a motion for permanent custody. First, the juvenile court must find the existence of one of the five conditions listed in R.C. 2151.414(B)(1)(a)-(e). Once the trial court has determined that any one condition exists, it then must determine by clear and convincing evidence that permanent custody is in the best interest of the child pursuant to R.C. 2151.414 (D). *In re Z.C.*, 2023-Ohio-4703, at ¶ 7.

{¶ 33} For the first prong in the analysis of X.R.'s case, the relevant subsection under R.C. 2151.414(B)(1) is as follows:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the

child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 34} In X.R.'s case, the juvenile court made a R.C. 2151.414(B)(1)(a) finding that X.R. "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." This finding was made pursuant to R.C. 2151.414(E). Mother disputes the juvenile court's finding that X.R. could not or should not be placed with a parent within a reasonable time. The juvenile court's R.C. 2151.414(E) findings regarding X.R. will be discussed below.

## C. R.C. 2151.414(E) Findings

{¶ 35} In both cases, the juvenile court made findings that the children could not be placed with Mother within a reasonable time or should not be placed with Mother pursuant to R.C. 2151.414(E)(1), (4), (14), and (16). Mother challenges the juvenile court's findings and its determination.

{¶ 36} R.C. 2151.414(E) provides, in relevant part, as follows:

If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A) (4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

. . .

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

. . .

(16) Any other factor the court considers relevant.

{¶ 37} "[A] court need only find that one of the R.C. 2151.414(E) factors applies to support a finding that a child cannot or should not be placed with her parent." *In re E.W.*, 2025-Ohio-5052, ¶ 38 (8th Dist.).

{¶ 38} The juvenile court found that multiple R.C. 2151.414(E) factors were present in L.H.'s case. The juvenile court's findings are as follows:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. *While mother has engaged in and completed some case plan services, she has not benefitted and continues to make inappropriate decisions.*

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. *Mother's decision making and inconsistencies in visitation with the child. Testimony showed that in the child's prior removal, mother stopped communicating with the child. Since the child's removal in this case and the date of trial, Mother has indicated to the Agency that she did not want reunification, she has not visited in person with the child,*

*they have had 1 virtual visit and a few phone calls, and sometimes when the child calls mother, she does not answer.*

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child[,] or to prevent the child from suffering physical, emotional, or sexual abuse[,] or physical, emotional, or mental neglect. *The child has been exposed to multiple domestically violent incidents in the home.*

(16) Any other factor the Court finds relevant: *Mother has two other children who were removed from her care by CCDCFS and placed with maternal grandmother in Michigan through a safety plan. Grandmother violated the safety plan by giving the kids to their father in Michigan, where the children remain today. The serious nature of the abuse on the child's sibling and cousins, as well as the continued exposure to abuse in the home, makes the child's placement with the mother a threat to the child's safety.*

(Emphasis in original.)

{¶ 39} The juvenile court found that multiple R.C. 2151.414(E) factors were present in X.R.'s case. Those findings are as follows:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. *While mother has engaged in and completed some case plan services, she has not benefitted and continues to make inappropriate decisions.*

(4) The parent (Father and Mother) has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child. *Mother's decision making and inconsistencies in visitation with the child.*

(10) The parent (Father) has abandoned the child.

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child[,] or to prevent the

child from suffering physical, emotional, or sexual abuse[,] or physical, emotional, or mental neglect. *Mother continues to have domestically violent incidents in her home, which the child's sibling was exposed to.*

(16) Any other factor the Court finds relevant: *Mother has two other children who were removed from her care by CCDCFS and placed with maternal grandmother in Michigan through a safety plan. Grandmother violated the safety plan by giving the kids to their father in Michigan, where the children remain today. The serious nature of the abuse on this child, as well as the continued exposure to abuse in the home, makes the child's placement with the mother a threat to the child's safety.*

(Emphasis in original.)

{¶ 40} The juvenile court did not err when it found that X.R. and L.H. could not or should not be placed with Mother within a reasonable time. The record reveals that although Mother has completed case-plan services, she continues to make inappropriate decisions. For example, she allowed Uncle and his family to move into her home even after CCDCFS advised against it and after Uncle previously abused Mother's child in her home. In addition, although Mother asserts she intervened when Uncle abused his child in her presence, a review of the videos shows that her intervention came after significant abuse had already taken place. When law enforcement responded after the domestic-violence incident, Mother initially denied that Uncle was still in the home and that the incident occurred. L.H. was present during this incident. These events support the juvenile court's finding pursuant to R.C. 2151.414(E)(1) that Mother has not benefitted from case-plan services and continues to make inappropriate decisions. Therefore, we find that there was clear and convincing evidence from which the trier of fact could have

determined that X.R. and L.H. could not or should not be placed with Mother within a reasonable time pursuant to R.C. 2151.414(E)(1).

{¶ 41} As stated above, a finding of any one R.C. 2151.414(E) factor is sufficient to support a finding that a child cannot or should not be placed with their parent. We therefore decline to review the juvenile court's remaining R.C. 2151.414(E) findings. Having found that the juvenile court did not err when it found the first statutory requirement was present, we consider the second statutory requirement, best interest, below.

## D. Best Interest

{¶ 42} The second step in the analysis is determining if permanent custody is in the best interest of the children. The juvenile court looks to the factors laid out in R.C. 2151.414(D). In L.H.'s case, the juvenile court is required to consider the factors found in R.C. 2151.414(D)(1). In X.R.'s case, the juvenile court is required to make findings under one of two alternative provisions as set forth at subparagraphs (D)(1) and (D)(2) of the statute. The interplay has been explained as follows:

> "As we understand division (D)(2), if all of the facts enumerated therein apply, then an award of permanent custody is in the child's best interest, and the trial court need not perform the weighing specified in division (D)(1). But if it is not the case that all of the facts enumerated in division (D)(2) exist; that is, if any one of the facts enumerated in division (D)(2) does not exist, then the trial court must proceed to the weighing of factors set forth in division (D)(1) to determine the child's best interest."

*In re T.B.*, 2025-Ohio-2075, ¶ 37 (8th Dist.), quoting *In re K.H.*, 2010-Ohio-1609, ¶ 54 (2d Dist.).

{¶ 43} Here, the juvenile court made findings pursuant to R.C. 2151.414(D)(1) in both cases. R.C. 2151.414(D)(1) requires that when determining the best interests of a child, the court shall consider all relevant factors, including but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 44} Although R.C. 2151.414(D)(1) requires the juvenile court to consider all of the relevant factors in the subsection, "only one of these enumerated factors needs to be resolved in favor of the award of permanent custody." *In re S.C.*, 2015-Ohio-2410, ¶ 30 (8th Dist.), citing *In re Moore*, 2000 Ohio App. LEXIS 3958 (8th Dist. Aug. 31, 2000), citing *In re Shaeffer Children*, 85 Ohio App.3d 683 (3d Dist. 1993).

{¶ 45} In L.H.'s case, the juvenile court indicated that the R.C. 2151.414(D)(1) best-interest factors were considered, and made the following additional findings:

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. *GAL recommends temporary custody.*

(c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period. *The child was in Agency custody in AD23913241 since 2023. In that case, mother agreed to the child being adjudicated dependent and placed in the temporary custody of CCDCFS. Adjudication and Disposition were on February 20, 2024. On July 29, 2025, temporary custody was terminated and Mother received legal custody with protective supervision. (Exhibits1-2). The child was then placed back in Agency custody in the case at hand on August 13, 2025, just two weeks after temporary custody was terminated in the prior case.*

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody. *The child deserves a safe and stable home environment where his needs can be met and he can thrive. This cannot be achieved with mother as she has failed to remedy the cause for removal in order to provide a safe home for the child. Mother continues to lack appropriate decision making in order to provide for the safety of the child. Within two weeks after temporary custody was terminated in the prior case, mother allowed her brother and his family to move into her home, after being told not to by CCDCFS. Videos submitted during trial show very concerning and abusive behavior at the hands of mother's brother. The child was living with Mother when this incident occurred. Mother's brother and his wife had their children removed due the incident (the children were adjudicated abused, neglected, and dependent) and the brother and his wife are currently facing criminal charges as a result of the incident. (Exhibits 6, A, B, and E). The court does not find that mother displayed appropriate decision making during the incident as evidenced on the video (Exhibits 7 and G). Additionally, the child was living with mother in June 2025, when a separate domestically violent incident occurred with mother and her ex-husband resulting in pending charges for the ex-husband. (Exhibit C). Alleged Father is*

*deceased. No one else has been identified as willing and appropriate to care for the child.*

(Emphasis in original.)

{¶ 46} In X.R.'s case, the juvenile court indicated that the R.C. 2151.414(D)(1)

best-interest factors were considered and made the following additional findings:

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. *The child is too young to express his wishes. GAL recommends an extension of temporary custody.*

(c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period. *The child has been in Agency custody since September 2024.*

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody. *The child deserves a safe and stable home environment where his needs can be met and he can thrive. This cannot be achieved with mother as she has failed to remedy the cause for removal in order to provide a safe home for the child. The child came into Agency custody after a domestically violent incident between mother and husband. The child was adjudicated abused as a result of the incident and the Court found that mother and the child were injured during the incident. Mother continues to lack appropriate decision making in order to provide for the safety of the child as mother allowed her brother and his family to move into her home, after being told not to by CCDCFS. Videos submitted during trial show very concerning and abusive behavior at the hands of mother's brother. The child's sibling was living in the home when the incident occurred. Mother's brother and his wife had their children removed due the incident (the children were adjudicated abused, neglected, and dependent) and the brother and his wife are currently facing criminal charges as a result of the incident. (Exhibits 6, A, B, and E). The court does not find that mother displayed appropriate decision making during the incident as evidenced on the video (Exhibits 7 and G). Father does not have the ability to care for the*

*child. No one else has been identified as willing and appropriate to care for the child.*

(e) Whether any factors in divisions (E)(7) to (11) of this section apply in relation to the parents and the child. (E)(10) *applies to father*.

(Emphasis in original.)

{¶ 47} The record supports the juvenile court's R.C. 2151.414(D)(1)(a) finding for both children. In L.H.'s case, a review of the record reflects that since his removal in August 2025, Mother had not visited him in person, had one virtual visit with him, and a few phone calls. In X.R.'s case, a review of the record reflects that Mother was not consistent with visitation. In the month prior to the hearing, Mother missed three visits and left one visit early. Mother's lack of consistent visitation supports the juvenile court's finding pursuant to R.C. 2151.414(D)(1)(a). As discussed above, a finding of any single R.C. 2151.414(D)(1) factor is sufficient for a determination by the juvenile court to award permanent custody to CCDCFS. Therefore, we decline to address the juvenile court's remaining R.C. 2151.414(D)(1) findings.

{¶ 48} Mother asserts that the juvenile court erred when it granted CCDCFS's motion for permanent custody instead of extending temporary custody for an additional six months. The juvenile court explicitly found in X.R.'s case that

> [Mother] and Father have *not* made significant progress on the case plan, as required by ORC 2151.415(D)(1) and therefore a first extension of temporary custody cannot be ordered and would not be in the best interest of the child. Furthermore, there is not reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of the extension.

(Emphasis in original.) "It is well settled that, where an award of permanent custody is in a child's best interest, a six-month extension of temporary custody necessarily is not." *In re D.C.*, 2022-Ohio-1081, ¶ 27 (9th Dist.).

{¶ 49} Mother also asserts that because Uncle and Aunt were given the opportunity to complete services through a case plan with a goal of reunification, that Mother should be given the same opportunity. The GAL expressed this same reasoning as a partial basis for her recommendation for an extension of temporary custody. However, this assertion and the GAL's recommendation center on a sense of fairness to Mother and not the best interest of the children or the statutory requirements as outlined above. This court has previously found that "the juvenile court may not consider 'the effect the granting of permanent custody to the agency would have upon any parent of the child.'" *In re L.S.*, 2021-Ohio-510, ¶ 42 (8th Dist.), citing R.C. 2151.414(C). In addition, this court has previously stated that "'a trial court is not bound to follow a guardian ad litem's recommendation.'" *In re A.M.*, 2026-Ohio-1977, ¶ 44 (8th Dist.), quoting *In re M.W.*, 2017-Ohio-8580, ¶ 24 (8th Dist.).

{¶ 50} We find that there was clear and convincing evidence from which the trier of fact could have determined that permanent custody was in the best interest of the children.

{¶ 51} For the reasons stated above, we find that the juvenile court considered the relevant statutory factors in granting permanent custody, its findings were supported by competent, credible evidence, and CCDCFS presented sufficient

evidence to satisfy its burden at trial. Accordingly, Mother's single assignment of error is overruled and the juvenile court's orders terminating Mother's parental rights and granting permanent custody of the children to CCDCFS are affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
DEENA R. CALABRESE, JUDGE

MICHAEL JOHN RYAN, P.J., and
TIMOTHY W. CLARY, J., CONCUR